**UNITED STATES of America,**
**Appellant,**

v.

**Thomas SMITH; Brian Smith; Andrew Garth; Tyrone Payton; Paul Carpinteri, Jr.**

**No. 01–2605.**

United States Court of Appeals, Third Circuit.

Argued March 21, 2002.

Filed: June 24, 2002.

Shawna H. Yen, (argued), George S. Leone, Office of United States Attorney, Newark, NJ, for appellant.

Kevin H. Marino, (argued), Newark, NJ, for appellee Thomas Smith.

Robert L. Galantucci, (argued), Philip De Vencentes, Galantucci & Patuto, Hackensack, NJ, for appellee Paul Carpinteri, Jr.

Peter R. Willis, Willis & Young, Jersey City, NJ, for appellee Brian Smith.

Anthony J. Iacullo, Iacullo & Saluti, Montclair, NJ, for appellee Andrew Garth.

William D. Sayers, Yankowitz, Goldsmith & Sayers, Livingston, NJ, for appellee Tyrone Payton.

BEFORE: NYGAARD, ROTH and AMBRO, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

A jury found five Orange, New Jersey police officers—Thomas Smith, Brian Smith, Andrew Garth, Tyrone Payton, and Andrew Carpinteri—guilty of conspiring to violate Earl Faison's civil rights in violation of 18 U.S.C § 241. Thomas Smith, Brian Smith, and Andrew Garth were also convicted of substantive crimes in violation of 18 U.S.C. § 242. Following this verdict and upon the motions of the Defendants, the District Court issued a Fed.R.Crim.P. 29 post-verdict judgment of acquittal as to the conspiracy conviction of each officer. The government appeals, claiming that the District Court applied the wrong standard of review in overturning the jury verdict, misinterpreted Third Circuit conspiracy law as stated in *United States v. Gibbs*, 190 F.3d 188 (3d Cir.1999), and incorrectly failed to consider evidence of concerted actions of concealment among the officers after the victim's death. We will reverse and reinstate the conspiracy convictions of each officer.

### I.

On April 8, 1999, Orange, New Jersey police officer Joyce Carnegie was murdered while on duty. A composite sketch of the suspect in the murder was circulated, and the entire Orange Police Department began actively looking for him. On April 11, 1999, an Orange police officer saw Earl Faison, a man who resembled the suspect, enter a taxicab. The officer approached the cab to question Faison, who immediately ran away. As Faison ran, he reached for what the officer thought was a gun. The officer gave chase and ordered Faison to stop and drop his weapon, which Faison did. Faison resisted the officer's initial attempt to handcuff him, which resulted in his being pepper-sprayed. After the pepper-spray, Faison ceased strug-

gling, and the officer successfully handcuffed him.

By this point, nine other officers (including the five Defendants/Appellees) had arrived on the scene. Upon noticing Faison's resemblance to the murder suspect, witnesses claimed that Thomas Smith (who was the senior officer on the scene) punched Faison. Then Payton and Carpinteri punched Faison and threw him in a squad car. Garth and Thomas Smith then entered the squad car and repeatedly punched Faison as he lay on the seat. An unindicted officer pulled Smith and Garth out of the car.

After this beating, Thomas Smith ordered all of the officers to return to the police department with the suspect. This order conflicted with the established protocol of bringing suspects in the Carnegie murder to the Essex County Prosecutor's Office for questioning, and was also contrary to the routine police practice of leaving an officer at the scene of an arrest to handle calls. There was also testimony at trial that it was unusual for so many officers to accompany a suspect to the police station.

As the officers, in five separate cars, approached the police station, Thomas Smith ordered that they turn off their lights. Faison was brought into the station through the south entrance—which led to a locker room—even though the north entrance was the designated prisoner drop-off area. Numerous officers testified that they had never taken a prisoner through the south entrance of the police station.

Once in the station, Faison, still handcuffed, was laid on the floor of the south stairwell. Faison was never brought to the booking room, was never fingerprinted or photographed, and was never given the opportunity to wash the pepper-spray from his face and eyes—all of which was contrary to routine police practice.

After Faison was placed in the stairwell, Payton began yelling at him, removed money from Faison's pocket, suggested that the money be given to Officer Carnegie's mother, and then pointed his gun at the handcuffed Faison's head. When an unindicted officer grabbed Payton's weapon, Brian Smith sprayed pepper-spray at close range into Faison's nose and mouth. Faison's breathing became labored and he soon died of cardiac arrest.

Immediately after paramedics removed Faison's body from the police station, the officers initiated efforts to conceal their actions. Payton and Carpinteri wrote consistent but false incident reports; Garth and Brian Smith falsely claimed in their shift reports that they were not present at the arrest; and Thomas Smith neglected to mention in his commander's summary sheet his presence at the Faison arrest. Thomas Smith also instructed one officer not to write a report of the incident because "the less people on the scene the better," (App. at 1233), and Smith instructed the arresting officer not to file a report concerning the incident.

Faison did not kill Officer Carnegie. Six days after his death, Officer Carnegie's murderer was arrested.

## II.

In reviewing a Fed.R.Crim.P. 29 post-verdict motion for judgment of acquittal, a district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir.2001). The court is required to "draw all reasonable inferences in favor of the jury's verdict." *United States v. Anderskow*, 88

F.3d 245, 251 (3d Cir.1996). Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984). We have plenary review of a district court's grant of a post-verdict judgment of acquittal. *United States v. Leggett*, 162 F.3d 237, 241 (3d Cir.1998).

■ Title 18 of the United States Code, § 241, makes it a federal crime for "two or more persons [to] conspire to injure, oppress, threaten or intimidate any person ... in the free exercise" of his constitutional rights. 18 U.S.C. § 241. In granting the officers' Rule 29 motions on this conspiracy conviction, the District Court, relying on its interpretation of *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999), said, "the existence of a conspiracy cannot be inferred from evidence of related facts and circumstances, without a reasonable and logical inference that the activities of the participants *could not have been carried out* except as the result of a preconceived scheme or common understanding." (App. at 10) (emphasis added). Applying this standard, the District Court found that the jury verdict could not stand because "there are other plausible explanations for [the officers'] conduct than a preconceived scheme or common understanding," (App. at 13), and "[t]here is no evidence to support the *Gibbs* requirement of a reasonable and logical inference that [the officers'] activities could not have been carried on except as the result of a preconceived agreement or understanding." (App. at 20). This misapprehends the holding in *Gibbs* and fails to give the appropriate deference to the jury's verdict.

In *Gibbs* we stated:

To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal. *See United States v. Robinson*, 167 F.3d 824, 829 (3d Cir.1999). The government may prove these elements entirely by circumstantial evidence. *See McGlory*, 968 F.2d at 321 (citing *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)). The existence of a conspiracy "can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding." *Kapp*, 781 F.2d at 1010 (internal quotation omitted). The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants. *See United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir.1989), overruled on other grounds by *United States v. Price*, 13 F.3d 711, 727 (3d Cir.1994).

*Gibbs*, 190 F.3d at 197. The "could not have been carried on except as a result of a preconceived scheme or common understanding" language relied upon by the District Court is preceded by the permissive "can be inferred" language in *Gibbs*, rendering incorrect the District Court's statement that a conspiracy "cannot be inferred" unless the existence of a preconceived scheme is the only plausible explanation of the activities in question. Reading this permissive language as mandatory led the District Court to erroneously conclude that the officers' conspiracy convictions were not supportable.

As is clear from the context in *Gibbs*, the "preconceived scheme" sentence is simply one way in which a conspiracy "can be inferred" (hence the use of the permissive "can"). We did not ask in *Gibbs*, nor in any case since *Gibbs*, whether there was

478

a plausible, non-conspiratorial explanation for a defendant's actions. In *Gibbs*, we upheld the conspiracy conviction of the appellant Sydnor even though Sydnor claimed to have merely bought drugs from Gibbs, as opposed to having engaged in a conspiracy with *Gibbs*. *Gibbs*, 190 F.3d at 202. In that case, it was certainly *plausible* that Sydnor was merely a purchaser from, as opposed to a participant in, *Gibbs*'s larger drug operation. Nonetheless, we affirmed Sydnor's conspiracy conviction stating, "[v]iewing all the evidence in the light most favorable to the government, as we must, we believe that a reasonable jury could have concluded that Sydnor knew that he was dealing with a larger drug operation when he purchased drugs from Gibbs." *Id.* This is the standard the District Court should have used in evaluating the officers' Rule 29 motion.

■ Beyond *Gibbs*, our, and the Supreme Court's, jurisprudence, is consistent. To sustain a conspiracy conviction, the "contention that the evidence also permits a less sinister conclusion is immaterial. To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt." *United States v. Dent*, 149 F.3d 180, 188 (3d Cir.1998). *See also Holland v. United States*, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1955); *United States v. Carr*, 25 F.3d 1194, 1201 (3d Cir.1994); *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir.1990). Thus, the District Court's assertions to the contrary were erroneous.

■ The District Court also applied the incorrect standard for granting a Rule 29 motion. As we have said, "when deciding whether a jury verdict rests on legally sufficient evidence [ ][i]t is not for us to weigh the evidence or to determine the credibility of the witnesses. Rather, we must view the evidence in the light most favorable to the government, and will sus-

tain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dent*, 149 F.3d at 187 (internal citations omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (an inquiry into the sufficiency of the evidence "does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original) (internal citations omitted). Appellant correctly argues that the District Court drew inferences favorable to the defense and substituted its conclusions for those of the jury.

■ There were sufficient facts presented to the jury that could have lead a rational trier of fact to find beyond a reasonable doubt that the officers had engaged in a conspiracy to violate Faison's constitutional rights. For instance, there was testimony that each officer either threatened to or actually did physically harm Faison; that it was unusual for so many officers to accompany a suspect back to the station; that suspects in Officer Carnegie's murder were to be taken to the County Prosecutor's Office, instead of the jail where Faison was taken; that it was highly unusual to bring a suspect into the police station through the south entrance; and that the officers acted in concert to cover-up their actions. The fact that a group of people, arguably with a common goal—that of punishing Officer Carnegie's murderer—engaged as a group in so many unusual acts could certainly lead a reasonable juror to the conclusion that there was at least a tacit agreement between the officers, formed at the scene of the arrest,

that Faison was to be assaulted. Hence, we will reverse.

### III.

■ Finally, relying on *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the District Court found that "any acts of concealment which occurred after the use of pepper-spray in the south stairwell or at the very least at the time of death cannot be considered substantive parts of conspiracy under *Grunewald* [sic]." (App. at 8). Thus, when evaluating the sufficiency of the evidence to sustain the conspiracy convictions—evidence the jury was allowed to consider at trial—the District Court disregarded the evidence of:

> the false report attributed to Mr. Carpinteri, the false report attributed to Mr. Payton, the false report attributed to Brian Smith, the false report attributed to Andrew Garth … Thomas Smith's statement to Detective Jackson in response to Detective Jackson's question about preparing a report, 'No, the fewer, the better,' or words to that effect.

(App. at 8). This reliance on *Grunewald* was misplaced.

*Grunewald* held that an act of concealment does not constitute an "overt act" in furtherance of an 18 U.S.C. § 371 conspiracy for the purpose of determining the commencement date for the statute of limitations. The case did not discuss whether concerted acts of concealment may be considered in reviewing the sufficiency of the evidence to sustain a conviction under 18 U.S.C. § 241. The Supreme Court has limited *Grunewald*'s holding, stating,

"*Grunewald*, however, was a statute of limitations case, and whatever exasperation with conspiracy prosecutions the opinion may have expressed in dictum says little about the views of Congress when it enacted § 846." *United States v. Shabani*, 513 U.S. 10, 14, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994).[1]

The question to ask, then, is whether this evidence is relevant to finding a conspiracy, or in other words, whether it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Fed.R.Evid. 401. Because "[a]ll relevant evidence is [generally] admissible," Fed.R.Evid. 402, if we find these acts of concealment to be relevant to a finding of a conspiracy, and find no other reason for their exclusion, then they should have been considered by the District Court.

Other courts of appeals have considered acts of concealment relevant to determining whether a conspiracy existed. *See, e.g., United States v. Piche*, 981 F.2d 706 (4th Cir.1992); *United States v. Bigham*, 812 F.2d 943 (5th Cir.1987); *United States v. Davis*, 810 F.2d 474 (5th Cir.1987). Furthermore, it is intuitive that concerted actions to cover up the circumstances of Faison's death, taken just minutes after his death, have a tendency to suggest that the acts of brutality were undertaken as part of an agreement, as opposed to having been random, uncoordinated acts. Thus, because the evidence regarding the concerted cover-up was relevant (and was properly admitted during trial), the District Court erred by disregarding this evi-

---

1. We also note that the rule that co-conspirator hearsay statements are admissible to be used against a defendant only if made in furtherance of the conspiracy, *see Lutwak v. United States*, 344 U.S. 604, 617–18, 73 S.Ct. 481, 97 L.Ed. 593 (1953), is not applicable in the present case to limit evidence of acts of concealment which occurred after the object of the conspiracy had been accomplished, *i.e.,* after Faison's death.

dence in its evaluation of the officers' Rule 29 motions.

We conclude that, when viewed in the light most favorable to the prosecution, reasonable jurors could have found the existence of a conspiracy among the officers beyond a reasonable doubt. For this reason, the District Judge erred by granting a post-verdict judgment of acquittal on the conspiracy count, and we will reverse.

## CONCLUSION

In sum, and for the above reasons, we will reverse the District Court's grant of post-verdict judgments of acquittal, reinstate the conspiracy convictions under 18 U.S.C. § 241 as to each officer, and remand the cause to the District Court for sentencing on the reinstated counts.

AMBRO, Circuit Judge, concurring.

I concur both in the majority's decision and in nearly all its reasoning. Nonetheless, I write separately because the majority permits a mischievous loose line, which it takes from *United States v. Gibbs*, 190 F.3d 188 (3d Cir.1999), to remain part of our conspiracy jurisprudence. That line states that "a conspiracy can be inferred from evidence ... from which it appears ... that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding." *Id.* at 197.[1] This line is *dictum* and misstates our settled conspiracy law. We should repudiate it before it enables a guilty defendant to go free in an erroneous acquittal.

The problem with the offending *dictum* is that it suggests that a jury may not consider a defendant's conduct to be evi-

dence of a conspiracy unless there is *no other explanation* for it. That has never been the law in this Circuit. Indeed, the offending *dictum* is inconsistent with the principle that we must accept the jury's verdict "if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Gibbs*, 190 F.3d at 197. The majority and I agree that the offending *dictum* does not state a requirement for proving a conspiracy and cannot justify a post-verdict acquittal in this case. We part company, however, in deciding what to do with this language. I would simply reject it; the majority tries to work around it.

The majority adopts the Government's argument that we need not worry about the offending *dictum* because it does not purport to state a requirement in conspiracy cases, but merely describes one of many ways that the Government may prove a conspiracy. Maj.Op. at 477–78. Its explanation for this reading is that the sentence merely says that "a conspiracy *can* be inferred" from evidence that admits no other explanation, not that a conspiracy "*cannot* be inferred *unless*" such evidence exists. According to the majority, if this language stated a requirement, it would not use the word "can."

This explanation is unconvincing. First, another panel of our Court has already misread this language as if it states a requirement for conspiracy cases. In *United States v. Schramm*, 75 F.3d 156 (3d Cir.1996), this Court, reversing a conspiracy conviction, observed: "We, therefore, *cannot* conclude that the evidence adduced at trial allows a reasonable inference, that the activities of the participants ... could not have been carried on except as the

---

1. As I discuss below, this sentence did not originate in *Gibbs*, but rather has been passed down through several of our opinions beginning with *United States v. Barrow*, 363 F.2d 62, 64 (3d Cir.1966). For convenience, I often refer to it as the "offending *dictum*" in this concurrence.

result of a preconceived scheme or common understanding." *Id.* at 162 (internal quotation marks omitted) (emphasis added). The majority insists that the offending *dictum* merely suggests one way to prove a conspiracy, but *Schramm* obviously did not read it that way. Instead, *Schramm* said (in *dicta*, as explained below) that unless the standard is satisfied, no conspiracy exists. This demonstrates that as long as we allow the offending *dictum* to linger in our jurisprudence, courts will misread it to state a conspiracy requirement.

Moreover, it is natural that *Schramm*, having erroneously decided to cite the offending *dictum*, interpreted it to state a requirement. For example, if a judge charges a jury as follows—"you can find the defendant guilty of bank robbery from evidence that (1) he entered a financial institution and (2) obtained money by force"—he has obviously laid out the requirements for a bank robbery conviction. He has not simply suggested one of many ways that the jury may find the defendant guilty (even though the charge does not technically exclude that interpretation). Similarly, when the offending *dictum* says that "a conspiracy can be inferred from evidence ... from which it appears ... that the activities of the participants ... could not have been carried on except as

the result of a preconceived scheme or common understanding," the most natural reading is that it states a requirement, not a suggestion to the Government about one way to prove a conspiracy.

Unlike the majority, which tries to sidestep the offending *dictum*, I would simply reject it and state clearly that the courts of this Circuit should henceforth ignore it. The best evidence that it is not good law is that none of our cases takes it seriously. The sentence originated in our 1966 opinion in *United States v. Barrow*, 363 F.2d 62, 64 (3d Cir.1966). *Barrow* apparently spawned this *dictum* without any precedent, following it with a string citation to four cases that do not support it. *Id.*[2] Moreover, notwithstanding its apparent announcement of a new conspiracy standard, *Barrow* itself did not apply that standard. Instead, it upheld conspiracy convictions for operating illegal gambling businesses because a jury "could have" inferred the defendants' involvement and the evidence was "susceptible of a reasonable and logical inference" that a conspiracy existed. *Id.* at 64–65.

Subsequent conspiracy cases quoted, but similarly declined to apply, the offending *dictum*. In *United States v. Ellis*, 595 F.2d 154 (3d Cir.1979), police officers were convicted of a conspiracy to violate the

---

**2.** The four cases are *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Amedeo*, 277 F.2d 375, 377 (3d Cir.1960); *United States v. Monticello*, 264 F.2d 47, 49–50 (3d Cir.1959); and *United States v. Migliorino*, 238 F.2d 7, 9 (3d Cir.1956). *Glasser* says about this issue that "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and collocation of circumstances." 315 U.S. at 80, 62 S.Ct. 457 (internal quotation marks omitted). *Amedeo* notes that "[c]onspiracy involves some action in concert among conspirators but no one claims any more that there must be express

agreement among them. And a conspiracy may be proven by circumstantial evidence alone." 277 F.2d at 377. Perhaps most importantly, *Monticello* states what appears to be the opposite of the offending *dictum*: "[A] conspiracy charge may be sustained on such [circumstantial] evidence. Nor need the evidence be inconsistent with every conclusion save that of guilt, provided it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." 264 F.2d at 49–50. Finally, *Migliorino* provides that "[o]vert acts done in apparent pursuance of a common plan serve as evidence to demonstrate the existence of a conspiracy." 238 F.2d at 9.

civil rights of suspects in their custody. *Id.* at 160. We quoted the line from *Barrow*, but then upheld their conspiracy convictions without considering whether the evidence foreclosed every possibility other than the existence of a preconceived scheme or common understanding. Seven years later, in *United States v. Kapp*, 781 F.2d 1008 (3d Cir.1986), in which we faced an "admittedly sparse record," we again parroted the offending *dictum*, but then upheld a conviction for conspiracy to transport stolen motor vehicles because the defendant's participation in the conspiracy "could be inferred" from the evidence. *Id.* at 1010. In *Schramm*, as noted above, we misstated the offending *dictum* as a conspiracy requirement, but still did not rely on it. Rather we stated that "there must be evidence *tending* to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment," 75 F.3d at 159 (citation omitted) (emphasis added), and we only reversed the conviction in that case because no evidence supported it. *Id.* at 160. Finally, in *Gibbs* we upheld a conspiracy drug conviction even though we acknowledged that a mere buyer-seller relationship cannot prove a drug conspiracy and the district court had "no evidence that [the defendant] ever did anything to further the conspiracy other than buy and sell drugs." 190 F.3d at 199. Paying no attention to whether the evidence permitted no conclusion other than a preconceived scheme or common design, we upheld the conviction because "a reasonable jury could have concluded beyond a reasonable doubt that [the defendant] knew that he was dealing with a larger drug operation." *Id.* at 202.

Not only have we consistently ignored the offending *dictum* in our conspiracy analyses, we have frequently contradicted it. *E.g.*, *United States v. Dent*, 149 F.3d 180, 188 (3d Cir.1998) ("To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt.") (citation omitted); *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir.1990) (same); *United States v. Monticello*, 264 F.2d 47, 49–50 (3d Cir. 1959) (same).

That this Court has, for almost forty years, refused to apply the offending *dictum* makes sense. That language, taken literally, states an incorrect and almost impossible standard. It requires the Government to prove a negative: that no other explanation could possibly exist for a given set of facts except a conspiracy. This conflicts sharply with the basic principle, which *Gibbs* itself affirms, that we must uphold the jury's verdict whenever any rational view of the facts permits. *Gibbs*, 190 F.3d at 197. Moreover, it improperly transforms the reasonable doubt standard into a requirement of jury certainty. *See Victor v. Nebraska*, 511 U.S. 1, 18, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (approving a jury instruction stating that reasonable doubt does not mean "absolute or mathematical certainty"). We should unambiguously reject this incorrect language before it confuses the next court to consider it.