**Billy Ray GRIMES, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 23629.

United States Court of Appeals
Fifth Circuit.

June 30, 1967.

Charles W. Tessmer, Henry J. Novak, Jr., Dallas, Tex., for appellant.

B. H. Timmins, Jr., Asst. U. S. Atty., Melvin M. Diggs, U. S. Atty., Dallas, Tex., for appellee.

Before GEWIN, COLEMAN, and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge:

The Grand Jury indicted Edward Vincent Driscoll for [Count I] unlawfully, wilfully, and knowingly traveling in interstate commerce from Billings, Montana, to Dallas, Texas, with intent to distribute the proceeds of an unlawful activity, gambling in violation of the Laws of Texas, and with intent to promote, manage, carry on, and facilitate such promotion, management, and carrying on of such unlawful activity, in violation of 18 U.S.C. § 1952.[1] The Count further charged that Billy Ray Grimes and Albert Meadows knowingly, wilfully,

1. 18 U.S.C. § 1952.
Interstate and foreign travel or transportation in aid of racketeering enterprises

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury.

5a. Aiding and abetting
A defendant who furnished employment in Indiana in a gambling enterprise to three employees who resided in Illinois could be found guilty of violation of this section proscribing interstate travel or transportation in aid of racketeering enterprises on basis that such employment of Illinois residents amounted to an aiding or abetting of their interstate travel. United States v. Zizzo, C.A.Ind.1964, 338 F.2d 577, certiorari denied 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435.

10. Evidence
That court determined that evidence was insufficient to support conviction for substantive offense of travel in interstate commerce with intent to aid racketeering enterprises did not require that it strike and remove from jury consideration on conspiracy count all evidence indicating conspiracy prior to termination of events alleged under substantive count, where there remained substantial evidence from which jury could infer that conspiracy had begun prior to acts averred in substantive counts. Marshall v. United States, C.A.Cal.1966, 355 F.2d 999.

Evidence of substantial course of illegal conduct, occurring reasonable time before and after act of interstate travel, allows jury to infer that travel was undertaken with intent to carry on unlawful activity. United States v. Compton, C.A.Tenn., 1966, 355 F.2d 872, certiorari denied 384 U.S. 951, 86 S.Ct. 1571, 16 L.Ed.2d 548.

Evidence failed to sustain conviction for interstate travel in aid of racketeering and interstate transportation of wagering paraphernalia. United States v. Honeycutt, C.A.N.C., 1962, 311 F.2d 660.

and unlawfully aided, abetted, commanded, procured and induced the commission of the alleged offense. Driscoll and Meadows pleaded guilty to this Count and were sentenced to imprisonment. Grimes pleaded not guilty, stood trial to a jury, was convicted, and sentenced to two years imprisonment and a fine of $2,500.

Count III charged that Albert Meadows committed a similar offense in that he unlawfully, wilfully, and knowingly used and caused to be used facilities in interstate commerce, including the United States Mails in interstate commerce between Dallas, Texas, and Oklahoma City, Oklahoma, by causing to be transported a certain cashier's check with intent to distribute the proceeds and to promote, manage, and carry on the same unlawful activity alleged in Count I, and further charged that Driscoll and Grimes aided and abetted the commission of this offense.

Driscoll pleaded guilty to this count and was sentenced. Grimes pleaded not guilty, was convicted, and sentenced for this offense.

Count IV charged a conspiracy between Meadows, Driscoll, Grimes, and another to travel in interstate commerce and to use mail and wire facilities in interstate commerce as described in Counts I and III. Grimes was likewise convicted and sentenced on this Count.

The convictions as to Counts I and III must be reversed. The conviction as to Count IV will be affirmed.

Upon the verdict of the jury, and finding it supported by the evidence, we adopt the Government's appellate statement of facts, without quotation marks, as follows:

James Miles Jackson, an oil drilling contractor from Billings, Montana, met Ed Driscoll in Dallas in July, 1962. After discussing various prospects for oil ventures, Driscoll drove Jackson to a house located at Route 1, Box 608, Irving, Texas. Upon their arrival Jackson observed a gambling game in progress. He met Al Meadows in the house and saw appellant Grimes working behind the dice table occupied by the stick man who handles the dice, brings them in after they are rolled and pushes the dice to the next shooter. The banker, or box man as he is sometimes called, pays off and collects the bets. Grimes was working the dice game and was not engaged as a player. Jackson shot dice for three or four hours and gave checks to Al Meadows for his losses in the approximate amount of $50,000. Jackson was then driven to the airport by Edward Driscoll where he caught a flight to Duncan, Oklahoma that evening. He returned to Dallas the next morning and was again taken to the same house by Ed Driscoll where he met Al Meadows and co-conspirator Warren Gilbert, who was then Vice-President of the Greenville Avenue State Bank in Dallas. Gilbert was introduced to Jackson by Meadows as "our banker". Gilbert examined Jackson's financial statement and Jackson made arrangement to give Meadows interests in certain oil drilling operations in partial payment of the gambling debt. Jackson returned to his home in Billings, Montana where he was visited by Ed Driscoll in August, 1962. They discussed payment of the gambling debt and Jackson purchased a $5,000 cashier's check payable to the Greenville Avenue State Bank in Dallas, which he gave to Driscoll stating to him that "there is a check for part of the gambling debts". Special Agent Lawrence Talbot of the FBI testified from examination of records of the Mountain States Telephone Company (which were destroyed by the phone company after examination but prior to trial) that on August 20th, 1962, Ed Driscoll placed a call from the Northern Hotel in Billings, Montana, to appellant Billy Ray Grimes which was completed. The following day, August 21st, 1962, Ed Driscoll again placed a call from his hotel in Billings to Billy Ray Grimes but was unable to get an answer. Later on the same day Ed Driscoll placed a call from Billings, Montana, to appellant Grimes in Dallas which was completed. Again, on the same date Ed Driscoll placed a call from his room in the Northern Hotel in Billings, Montana, to Dallas attempting

to locate appellant Grimes; after Grimes failed to answer the call—the call was then made to Greenville State Bank in Dallas and the caller talked to co-conspirator Warren Gilbert. After Miles Jackson gave the $5,000 cashier's check to Ed Driscoll he subsequently had a telephone conversation with Al Meadows in which Meadows acknowledged receiving the check. (The evidence above related to Counts One and Four of the Indictment).

In a subsequent, similar occurrence Joe Dan Trigg, an oil drilling contractor from Oklahoma City, met Ed Driscoll in Dallas in June or July, 1962. In late September or October, 1962, Trigg accompanied Driscoll to a residence where he met Al Meadows and lost $7,000 in a dice game. He prepared a personal check payable to cash and thereafter returned to Oklahoma City. Trigg identified a photograph of the residence located at 1910 Copeland Road (also known as Baird Farm Road) Arlington, Texas, as the place where the dice game occurred. After several phone conversations between Meadows and Trigg it was agreed that Meadows would send someone to Oklahoma City to pick up a cashier's check from Trigg in exchange for the personal check which Trigg had originally given Meadows in payment of the gambling debt. Trigg purchased a $7,000 cashier's check on October 19, 1962, payable to Al Meadows, which he handed to an unidentified man in front of a hotel and received the personal check which he had given Meadows at the time of the gambling loss. Trigg stated that the $7,000 represented the settlement of a gambling debt.

Co-conspirator Warren Gilbert testified that he had seen appellant Grimes at each gambling house where Jackson and Trigg shot dice and lost money. On those occasions Grimes was conducting the dice game. Government's exhibit No. 6 was a signature card reflecting a partnership checking account at Greenville Avenue State Bank for appellant Grimes and Al Meadows for a private club located at the Arlington gambling house, 1910 Copeland Road—Baird Farm Road.

Philip Vickery purchased the Arlington, Texas, residence at which Trigg lost the $7,000 from appellant B. R. Grimes and Al Meadows. Deed records of Tarrant County, Texas were introduced reflecting that Grimes and Meadows purchased the Arlington gambling house on August 30, 1962, and owned the house at the time of the dice games in question. After Trigg gave the $7,000 cashier's check to the unidentified person in Oklahoma City Al Meadows presented the check on October 22, 1962, to Warren Gilbert who was then President of the East Dallas Bank and Trust Company. In purchasing four cashier's checks representing a total of $7,000 Meadows told Gilbert "I would like to get some cashier's checks to divide up the winnings". Government's exhibit No. 10, was one of the four cashier's checks and was payable in the amount of $1,400 to Billy Ray Grimes. Gilbert testified that on October 23, 1962, appellant Grimes in the company of Al Meadows entered the bank and asked Gilbert to approve the cashing of each of the four cashier's checks. The $1,400 cashier's check payable to Grimes was endorsed and cashed. Special Agent Durley B. Davis, Jr. of the FBI, an expert examiner of questioned documents, positively identified Grimes endorsement on government's exhibit No. 10 with the known signatures of appellant Grimes. After Grimes and Meadows cashed the checks they left the bank together. In connection with Grimes' operation of the dice games, Gilbert had observed Grimes extend credit to players, sell chips and take in money. Gilbert testified that during the summer of 1962 he frequently saw Grimes and Meadows together at the bank and at the gambling houses.

Government's exhibit No. 27 which was admitted into evidence reflected that appellant Grimes listed his occupation as "gaming" on his 1962 income tax return. He stated that the location of his business activity was "various".

At the close of the proof for the Government, Grimes moved for a judgment of acquittal on the ground that the evidence was insufficient to prove the of-

fense charged. The motion was denied. The defense offered no proof, unsuccessfully renewed its motion for acquittal, and the case went to the jury.

■ As to Count I, Grimes is not charged with traveling in interstate commerce but with aiding and abetting Driscoll in that activity. As to Count III Grimes is not charged with causing the transmission of the cashier's check in interstate commerce but with aiding and abetting Meadows in that activity. In order to convict him as an aider or abettor the Government had to show conduct on his part amounting to counselling or other assistance in the prohibited activity, 18 U.S.C. § 2; Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Honeycutt, 4 Cir., 1962, 311 F.2d 660.

■■ From the foregoing proof, did the Government meet its burden? We are convinced that it did not. Reviewing the evidence, as we are bound to do, in the light most favorable to the Government, it is evident that Grimes was an integral part of a gambling operation in violation of the laws of Texas. He owned one of the houses, formerly had a "club" at the site of another, and acted as stick man and box man during the dice games in question. He was present when Jackson and an alleged co-conspirator discussed satisfaction of Jackson's gambling debt, but he did not participate in the discussion nor is it really shown that he actually heard the conversation. It would be reasonable to infer that he knew Driscoll went to Billings to collect the debt. He certainly received his share of the winnings from the check Meadows caused to be transported in interstate commerce. Where is the proof from which the jury could have inferred that Grimes counseled or assisted in the trip to Montana or the transportation of the check? The only really incriminating circumstance as to Count I is that Driscoll did telephone Grimes from Billings, but the content of the conversations is unknown. We consider it of some significance that Driscoll, the actor, did all the calling. Grimes did not call him. In the absence of further incriminating facts we cannot say that one is subject to conviction as an aider and abettor solely because he received a telephone call, of unknown content, from one who was actually committing the primary offense.

Remembering that Grimes is not here being prosecuted for violating the gambling laws of Texas, of which he clearly appears to have been guilty, the only really incriminating circumstance as to Grimes' aiding and abetting the transportation of the Oklahoma City check is the fact that he received part of the proceeds of that check in the form of another cashier's check purchased in Dallas. What did Grimes do to counsel or assist in the actual transportation of the Oklahoma City check? We can find no proof of this.

■ As we said in Causey v. United States, 5 Cir., 352 F.2d 203 (1965), the Government proved that Grimes had every opportunity to become an aider and abettor but the proof is insufficient to establish that he actually became one.

Therefore, the conviction as to Counts I and III must be reversed.

■■ As to Count IV, appellant concedes that the evidence may well support a finding that he was part of a conspiracy to violate state law, but he contends that there is no independent proof that Grimes knew the interstate travel or interstate transportation of the check were being conducted with specific unlawful intent. We cannot agree with this view. Once a criminal agreement becomes operative and a defendant has joined a conspiracy (the evidence amply supports such a finding here), the acts of any member are attributable to each partner to the conspiracy and the partners act for each other in carrying out its objective, Downing v. United States, 5 Cir., 1965, 348 F.2d 594. The jury was not unreasonable in concluding, as it obviously did, that a conspiracy to lure out of state gamblers would most likely lead to the collection of gambling debts thus incurred by some form of interstate travel or communication and that Grimes

foresaw such an eventuality. Judgment of conviction as to Count IV will thus be affirmed.

■ Grimes contends that the introduction of his 1962 income tax return in which he stated that his business was gaming violated his Fifth Amendment rights. We believe this contention to be without merit, cf. United States v. Zizzo, 7 Cir., 1964, 338 F.2d 577, cert. denied 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435.

Assuming, without deciding, that the law required Grimes to truthfully state his occupation on the 1962 return, that a false statement would subject him to a criminal penalty, and that he was thus forced to report as he did, he nevertheless had the right to claim self incrimination at that time. Not claiming it then, his statement amounted to a voluntary admission which we hold could be used in this prosecution.

Appellant's other assignments of error are found, upon consideration, to be without merit and do not justify further discussion.

The Judgment of the District Court will be affirmed as to Count IV and reversed as to Counts I and III.

*Affirmed in part, and in part reversed.*